```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                          16 CR 371 (RA)

 5   GARY HIRST,

 6                   Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         September 7, 2018
 9                                       3:30 p.m.

10
     Before:
11
                         HON. RONNIE ABRAMS,
12
                                         District Judge
13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BRENDAN FRANCIS QUIGLEY
17   NEGAR TEKEEI
     REBECCA GABRIELLE MERMELSTEIN
18        Assistant United States Attorneys

19   BARRY LEVIN
          Attorney for Defendant
20
     ALSO PRESENT:  Shannon Bieniek, FBI
21

22

23

24

25
```

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your names

3     for the record.

4          MR. QUIGLEY:  Good afternoon, your Honor.  Brendan

5     Quigley, Rebecca Mermelstein, and Negar Tekeei for the

6     United States.  We're joined by FBI agent Shannon Bieniek.

7          THE COURT:  Good afternoon everyone.

8          MR. LEVIN:  Barry Levin on behalf of Mr. Hirst.

9          Good afternoon, everyone.  Good afternoon, Mr. Hirst.

10         So this matter is on for sentencing in United States

11    v. Hirst.  Mr. Hirst plead guilty in May before

12    Magistrate Judge Moses, and I'm now formally going to accept

13    that plea on the record.

14         In connection with today's proceeding, I've reviewed

15    the following submissions:  The revised presentence report

16    dated August 29 of 2018; Mr. Hirst's sentencing memorandum

17    dated August 31 with accompanying exhibits; his prior

18    sentencing memorandum filed in the case before Judge Castel and

19    filed under seal; as well as various medical records and

20    documentation; as well as the government's sentencing

21    memorandum dated September 4.

22         Have the parties received each of these submissions?

23         MR. QUIGLEY:  Yes, your Honor.

24         MR. LEVIN:  Your Honor, I believe there might be --

25    there is a medical summary, an update, dated August 8 from 5th

Avenue Forensics, which is a neurological evaluation Mr. Hirst

had this summer.  That was also submitted to the Court.

          THE COURT:  Yes.  I have reviewed that as well.  I

also have your August 13 letter, but I have considered all of

those submissions.

          MR. LEVIN:  Thank you, your Honor.

          THE COURT:  Great.  Thanks.

          So why don't we begin by discussing the presentence

report.

          Have you reviewed the presentence report and discussed

it with your client?

          MR. LEVIN:  I have, your Honor.

          THE COURT:  You've noted a number of objections.  So

why don't we talk about them.

          First, with respect to the amount of loss, what is

your basis for arguing that the loss did not exceed

$25,000,000?

          MR. LEVIN:  Your Honor, as set forth in my initial

objection letter, Mr. Hirst was only involved in the first

round of the bond sales.  As set forth in my submissions, he

basically was there for three days at Hughes Capital.

          He never was a formal employee.  His role was limited

to calculating interest.  It's our position that when he signed

the trade tickets, he was no different than a secretary acting

in a ministerial act.  He had no authority.

1          Subsequent to his three days present there, his other

2    involvement was opening the WAPC account where the proceeds

3    went, but he acted in an ministerial act.  As your Honor is

4    aware -- your Honor sat through a long trial -- it was

5    controlled by Mr. Dunkerley.

6          Thereafter, Mr. Hirst had nothing to do with the

7    second and third round of bond acquisitions.  I believe that

8    took place in Atlantic.  Mr. Hirst was never there.  He was not

9    an employee.

10         It was not even foreseeable to Mr. Hirst that that

11   company was going to be acquired.  He had no communication with

12   Mr. Galanis.  A review of the emails during this time period

13   does not show anything attributed to Mr. Hirst.  All of the

14   emails are going back and forth between Michelle Morton and

15   Galanis concerning the second and third rounds of bond

16   acquisition.

17         THE COURT:  But the pension funds that purchased the

18   first tranche of the bonds never recovered any portion of their

19   principal of $27 million.  Right?  Why is that not alone

20   sufficient for the enhancement to apply?

21         MR. LEVIN:  Because I believe under the guidelines --

22   I quote from the section in my objections -- they were given

23   back 2,000,700 some odd thousand dollars in interest in

24   dividend payments which is an offset to the initial

25   acquisition.

1          THE COURT:  Do you want to respond, Mr. Quigley?

2          MR. QUIGLEY:  Yes, your Honor.  I think your Honor is

3     right that the pension funds are out $25 million.  They never

4     out -- sorry $27 million.  They never got any of their

5     principal back.  That is alone sufficient to go over 25.

6          I don't think we even need to get to the issue.  It's

7     just not right that Mr. Hirst wasn't involved in the subsequent

8     bond transactions.  He played a different role, but we go

9     through it in detail with our sentencing submission.

10          I'm not going to rehash it here.  It was certainly

11     foreseeable to him that additional money, certainly enough to

12     get over the $25 million hump in that next rung of the loss

13     ranges, was being misappropriated.

14          THE COURT:  I agree with you on both fronts.  I think

15     for the reasons stated in your letter and the reasons I noted,

16     it seems clear to me that the loss amounts exceeded $25 million

17     and, as I noted, the pension funds that purchased the first

18     tranche never recovered any portion of their principal of the

19     $27 million which alone is sufficient, but I also agree with

20     you with respect to his broader role.

21          MR. QUIGLEY:  They did get -- it is true the first

22     interest payment was made in September of 2015 with the

23     proceeds of the final issuance.  So the pension funds did get

24     some money back.

25          I think, again, given Mr. Hirst's involvement in the

1    subsequent issuances and in fact his involvement in repaying

2    back the pension funds' interest with the proceeds of the third

3    issuance, the subsequent issuances were clearly foreseeable to

4    him.

5          So I think, for that reason alone, you have the $27

6    million from the first issuance and the $16 million for the

7    third issuance were all foreseeable to him.

8          THE COURT:  Do you want to be heard further on that?

9          MR. LEVIN:  Your Honor, just briefly.  I'm relying on

10   application note 3E1 of Section United States Sentencing

11   Guidelines 2016 2B1.1.

12         That application note, your Honor, basically states

13   that an offset should be credited regardless of its source, and

14   that's where I'm coming up with this argument.

15         MR. QUIGLEY:  Your Honor, two things in response to

16   that.  It does say that, and Mr. Levin is correct.  That's a

17   different argument than he made in his objections to the PSR.

18   In the objections to the PSR, he said that Mr. Hirst should be

19   credited for monies paid to the WLCC, which is not right

20   because the pension funds were still out their money.  Even

21   if -- and it may be right under the application note.

22         Even if Mr. Hirst gets some setoff for the $2 million

23   or $2.7 million that was paid back to the pension funds in

24   interest such that the pension funds are only out

25   $24.3 million, say, it's still clearly reasonably foreseeable

1   to him that the $16 million from the third issuance would be

2   misappropriated, given his involvement in misappropriating

3   that.  That alone makes the loss well more than $25 million.

4         MR. LEVIN:  Your Honor, if I may just reply.

5         THE COURT:  You can respond.

6         MR. LEVIN:  Thank you, Judge.

7         As previously said, Mr. Hirst wasn't there.  He was

8   not a party.  Nor was he aware of where the source of the money

9   came from a year later.  He was not physically present.  He was

10  not managing the bank accounts.  All of this was being done by

11  Mr. Dunkerley.  Mr. Hirst was out of the picture at that point.

12        To the extent we are talking about the loss amount and

13  his responsibility for the total loss, he's not there.  It's

14  not reasonably foreseeable under 1B1 of the guidelines that

15  Mr. Hirst is even aware Atlantic is going to be opened up.

16        I would ask the government to submit to this Court one

17  indicia of evidence that Mr. Hirst was aware of Atlantic and

18  dealt with Atlantic.  That's my point.

19        MR. QUIGLEY:  Judge, he had control of the WLCC

20  account.  There were emails -- he opened that account.  He

21  clearly could see the money coming into that account from the

22  Atlantic investors, and there are emails that he's involved in

23  wiring that out.

24        We cite on page 2 of our sentencing submission,

25  Government's Exhibit 1583 where he and Dunkerley and Galanis

1    are discussing using fund from the WAPC account to pay off

2    Galanis' American Express bill; Government Exhibit 1587 where

3    he's directing the $2.4 million wire out of the WAPC account to

4    Burnham; Government Exhibit 1436, an email from Mr. Hirst to

5    Andrew Godfrey attaching information about a wire from the WAPC

6    account to Seymour Capital, Seymour Capital of course being one

7    of the entities that Mr. Hirst had created in somebody else's

8    name after buying shares in the Code Rebel IPO with the

9    proceeds of the final bond issuance.  We really don't think

10    it's a close question that the loss amount for the third

11    issuance was reasonably foreseeable to him.

12          THE COURT:  I agree with the government that it was

13    reasonably foreseeable to him for all the reasons that I just

14    noted.  So I agree with the calculation in the presentence

15    report with respect to loss amount.

16          Is there also still an objection to the two-level

17    enhancement for the offense involving ten or more victims?

18          MR. LEVIN:  I have not asserted an objection,

19    your Honor, but I will rely on my papers.

20          THE COURT:  That's fine.  I'll just rule on it.

21          I think this enhancement clearly applies in my view.

22    Mr. Hirst's objection appears to be on the basis that only nine

23    of the victims, the pension funds, were reasonably foreseeable

24    to him.

25          But the number omits the Wakpamni Lake Community

Corporation.  It belies common sense to think, particularly

given Mr. Hirst's role in setting up the annuity provider to

which the WLCC's money was deposited if he did not foresee it

as a victim, even if he personally didn't make any

misrepresentations.

Do you also want to be heard with respect to the

four-level enhancement for being associated with an investment

adviser, do you want to rely on your brief in that respect?

MR. LEVIN:  Your Honor, once again, I'm going to rely

on my previous submission and both my objections to the extent

I comment on them in my sentencing memo.  I believe that's a

close question.

It's our position that Mr. Hirst's acts were that of a

secretary, ministerial.  He had no decision-making.  He wasn't

an employee.  He did not advise or communicate with any of the

victims of this crime.

THE COURT:  Just give me one second.

The argument by Mr. Hirst, in my view, is devoid of

merit.  As the government notes, it's undisputed that Hughes

qualified as an investment adviser.  Moreover, all employees of

an investment adviser are considered to be associated pursuant

to application note 15 of Section 2B1.1 of the sentencing

guidelines.

To the extent Mr. Hirst is arguing that he doesn't

qualify because he was clerical or ministerial staff, that

1    argument is unpersuasive in my view.

2         As in initial matter, while Mr. Hirst's tenure at

3    Hughes may have been relatively short-lived, he was held out as

4    the chief investment officer and signed trade tickets affecting

5    transactions which is far from being a member of the clerical

6    or ministerial staff.

7         Even assuming that he was such a staff member, the

8    language on which he relies doesn't support his argument.

9    In fact, the pertinent provision of the Investment Advisers Act

10   specifies that only for purposes of another section of the act

11   shall clerical or ministerial staff be excluded, not for

12   purposes of establishing the scope of this sentencing

13   enhancement.  See 15 U.S.C. Section 80B-2(a)(17).

14        This outcome is also in accord with Judge Lynch's

15   decision in *United States v. Emminger*, 329 F.Supp.2d at 420 to

16   21, which concerned an analogous situation.

17        So finally, do you want to be heard on the minor role?

18   Or do you want to also rely on your submission?

19        MR. LEVIN:  I'll rely on my submission, your Honor.

20        THE COURT:  So I'm not going to apply the minor role

21   reduction.  I've considered the relevant factors set forth in

22   application note 3(C) to Section 3B1.2, and I just don't see

23   how the reduction applies here.

24        Mr. Hirst is obviously correct in noting that he

25   played a less significant role in the overall conspiracy than

Jason Galanis, but that's not the relevant inquiry.  Rather,

the enhancement applies if the defendant is less culpable than

most other participants in the criminal activity.

As the government notes, all six of the individuals

indicted with Jason Galanis have asserted some form of the same

offense in pinning the blame on him.  In the Court's view,

Mr. Hirst is not substantially less culpable than his other

five codefendants.

Among other activities, he set up the annuity

provider, Wealth-Assurance Private Client, that was supposed to

invest the bond proceeds on behalf of the WLCC; established the

bank account associated with the annuity provider into which

the bond proceeds were deposited; acted as an adviser when

several of his coconspirators closed the transaction to acquire

Hughes Capital Management, a registered investment adviser;

remained associated with Hughes after the acquisition during

which time he analyzed client portfolios, was held out as the

chief investment officer, and failed to disclose the numerous

conflict of interest related to the purchase of the WLCC bonds

on behalf of Hughes' clients, even though he signed the tickets

effecting those trades; provided advice related to the

conspirators' later acquisition of another registered

investment adviser, Atlantic Asset Management; wired criminal

proceeds from the account associated with an annuity provider

to fund the purchase of the European fund, that fund to pay

1   American Express charges made by Jason Galanis, the undisputed

2   mastermind of the fraud; participated in the purchase of

3   87 percent of the shares offered in the Code Rebel IPO using

4   misrepresented bond proceeds; and helped facilitate the initial

5   interest payment on the bond sold in the first instance which

6   prevented the fraud from being detected sooner.  So I think

7   there is no basis to apply the minor role reduction.

8             Do you have any other objections to the PSR?

9             MR. LEVIN:  I do not, your Honor.

10            THE COURT:  Mr. Hirst, did you have enough time and

11  opportunity to review the presentence report and raise any

12  problems that you might have with it with your attorney?

13            THE DEFENDANT:  Yes, your Honor.

14            THE COURT:  Does the government have any objections to

15  the presentence report?

16            MR. QUIGLEY:  We don't, your Honor.

17            THE COURT:  The Court adopts the factual findings in

18  the report.  The presentence report will be made part of the

19  record in this matter and placed under seal.  If an appeal is

20  taken, counsel on appeal may have access to the sealed report

21  without further application to the Court.

22            Mr. Hirst, when you pled guilty, you discussed the

23  sentencing guidelines with Magistrate Judge Moses which are a

24  set of rules published, as you know, by the Sentencing

25  Commission in order to guide judges when they impose sentence.

 1          Although at one time they were mandatory, meaning

 2   judges were required to follow the sentencing guidelines, they

 3   are no longer mandatory.  But judges must nonetheless consider

 4   the guidelines in determining a sentence and thus must make

 5   sure that they have calculated them properly.

 6          Based on my independent evaluation of the sentencing

 7   guidelines, I accept the guidelines calculation in the

 8   presentence report.  I find that Mr. Hirst's offense level is

 9   33, his criminal history category is II, and his recommended

10   guideline sentence is 151 to 188 months.

11          As I said a moment ago, that range is only advisory.

12   Courts may impose a sentence outside of that range based on one

13   of two legal concepts, a departure or a variance.  A departure

14   allows for a sentence outside of the advisory range based on

15   some provision of the guidelines themselves.

16          My understanding is you're not seeking a departure

17   but, rather, a variance pursuant to 18 U.S. Code, Section

18   3553(a).  Is that correct?

19          MR. LEVIN:  That is correct, your Honor.  Based on

20   Mr. Hirst's medical condition.

21          THE COURT:  I have nonetheless considered whether

22   there is an appropriate basis for a departure from the advisory

23   range within the guidelines system.  And while recognizing that

24   I have the authority to depart, I don't find any grounds

25   warranting a departure under the guidelines.

1          I do have the power, as we discussed, to impose a

2     non-guideline sentence based on what we call a variance, and

3     with that, I'm happy to hear from the parties.

4          Does the government wish to be heard, or do any

5     victims wish to be heard today?

6          MR. QUIGLEY:  Your Honor, we'll rest on our

7     submission, unless the Court has any questions.

8          THE COURT:  Does defense counsel want to be heard?

9          MR. LEVIN:  I would, your Honor, briefly.

10         Your Honor, Gary Hirst, prior to 2007, had an

11    unblemished life.  He was in the financial industry for many

12    years prior to his meeting Jason Galanis.

13         As set forth in the presentence report, there was

14    actually a point in time where he was managing $600 million.

15    He never had a claim, civil or criminal.  He never had an

16    investigation.  He never had a subpoena.  Then he met Jason

17    Galanis.

18         As set forth in my submission, Mr. Hirst, although a

19    very intelligent man before his onset of his current medical

20    conditions, will I'll address a little further -- he's naive.

21    He was a loner.  He was an academic.

22         He was enamored by Jason Galanis.  He was -- Jason

23    Galanis was a hero to Mr. Hirst.  Mr. Hirst very gullible.  He

24    accepted everything that Mr. Galanis told him.  Mr. Galanis had

25    him stay in Beverly Hills.  Mr. Hirst became very impressed

1    with him.  Gary Hirst became a pawn on a chessboard that was

2    moved around the country for Galanis' different schemes.

3         And Mr. Hirst, although certainly academically

4    intelligent enough, should have questioned.  He never

5    questioned.  He did what he was told.

6         But while this was going on, your Honor, he also was

7    in the onset of dementia, which has now resulted, at least

8    according to Dr. Baldwin's summary, he has Alzheimer's.

9         When you look at the prior presentence report, there

10   is the medical background where they say he has dementia.  It's

11   affecting his reasoning.  It's affecting his memory, his

12   clarity, his ability to think, his ability to reason.

13        I do not profess to be a neurologist, but I submit to

14   your Honor that Mr. Hirst's actions were criminal, were

15   serious.  But there was not the moral turpitude to personally

16   become a multimillionaire as Mr. Galanis.  He was merely trying

17   to please his friend.  As a result of that, he sits here before

18   you now twice convicted of fraudulent conspiracies in the

19   financial markets.

20        Currently, Mr. Hirst weighs 130 pounds.  He stands 6'

21   1".  When he arrived in New York, he was 155 pounds.  He's

22   reaching a point where he is unable to even manage his

23   nutrition and manage his affairs.

24        The Alzheimer's is only going to get worse.  Should

25   this Court sentence Mr. Hirst to his guidelines or anything

1    close to his guidelines, there is a very strong likelihood he

2    will die in prison without the proper medical care he needs.

3          I think it's also important to point out that we

4    readily acknowledge Mr. Hirst's company receiving $1.3 million

5    in this case.  However, I want the Court to understand that

6    Mr. Hirst did not put that money in his pocket.

7          He actually remitted that money to Insurance Companies

8    of America to pay claims because they had outstanding

9    settlement claims, workman's comp claims.  Those funds

10   literally went from Thorsdale to Rosemary, to ICA.  Mr. Hirst

11   did not travel Europe.  He did not put the money in the bank.

12   He did not buy a Rolls Royce.  He did not do anything.

13         That doesn't mean he's innocent of the crime, but I'm

14   trying to make a point -- and I don't know if I'm making it

15   clearly -- that he didn't do it for his personal benefit.  His

16   crimes were based on a child-like mentality with his hero

17   worship of Mr. Galanis.

18         THE COURT:  He was far from a child.

19         Wouldn't you agree?

20         MR. LEVIN:  Well, he's 66 years old, but I don't think

21   somebody with his education and his life experiences, prior to

22   meeting Mr. Galanis, was thinking on his own or thinking

23   clearly.

24         I've spent a lot of time with Mr. Hirst in the past

25   several months, since January when they brought me into the

1    case.  There are days he knows what's going on, and there are

2    days he doesn't know what's going on.  He's sometimes more

3    clear than others.

4            He's already serving 78 months from the prior

5    conviction.  He's a year into that sentence.  For the reasons

6    set forth in my sentencing memorandum and for the statements

7    that I've just made before this Court, we're asking this Court

8    to give us a substantial variance and hopefully give him a

9    concurrent sentence.

10           Mr. Hirst -- I had a case before Judge Kaplan very

11   recently, and he made a great statement.  We're not all

12   sinners, and we all have good in us.  Well, Mr. Hirst has

13   plenty of good in him as well.  If the Court has had the

14   opportunity to read all the letters that were submitted --

15           THE COURT:  I have.

16           MR. LEVIN:  -- he has spent a good portion of his life

17   helping others and taking money out of his own pocket.  None of

18   this condones his involvement in the conspiracy, but what it

19   does show is there are characteristics to this individual that

20   are good and that he is not someone that the criminal justice

21   system will ever have to worry about again.

22           So I am asking the Court to consider a concurrent

23   sentence for Mr. Hirst, knowing full well he has 78 months

24   ahead of himself, less a year.

25           THE COURT:  What kind of message do you think I'd be

1  sending to the victims if I gave a totally concurrent sentence

2  in this case?  If he didn't get any additional time based on

3  his conduct here that was alleged in this case?

4          MR. LEVIN:  Your Honor, I totally understand your

5  question.  If Mr. Hirst was not suffering from the cognitive

6  issues he currently has, as well as the numerous physical

7  issues, I wouldn't even be asking for a concurrent sentence.

8          But I honestly believe that he is somebody with a lot

9  of medical issues.  His Alzheimer's is only going to get worse,

10 and that is why I'm making the request I am.

11         Probation recommends 30 months.  The government is

12 seeking five years.  I don't envy your Honor.  You have the

13 toughest job in the business.  You have to figure out what the

14 right sentence is, considering the severity of the crime and

15 the individual that's before you today.

16         All I'm saying is that the individual that sits before

17 you today has numerous issues, and he's not walking out the

18 door and resuming his life any time soon.

19         THE COURT:  All right.  Thank you.

20         MR. LEVIN:  Thank you.

21         THE COURT:  Mr. Hirst, is there anything you would

22 like to say today?

23         MR. LEVIN:  I'm sorry, your Honor.  I didn't hear

24 that.

25         THE COURT:  I said, Mr. Hirst, is there anything you

1   would like to say today?  You have a right to be heard.  I'm

2   happy to hear anything you would like to say.

3              (Defendant and counsel conferred)

4              THE COURT:  You don't have to speak.  I've read all

5   the letters submitted on your behalf.  I read the submission

6   from your lawyer.  But if there's anything you would like to

7   say to me today, if there's anything you would like me to

8   consider, I'm happy to do that.  And you can take your time.

9              THE DEFENDANT:  Your Honor, I'm so sorry.  I feel so

10  stupid for trusting Jason, and I'm so sorry that people got

11  hurt.  I'm so sorry.  I'm so stupid.  I'm not stupid.  I'm --

12  what am I?  I don't know what I am.  I'm a nerd.  Sorry.  Thank

13  you, your Honor.

14             THE COURT:  Thank you.

15             Is there any reason why sentence cannot be imposed at

16  this time?

17             MR. QUIGLEY:  No, your Honor.

18             MR. LEVIN:  No, your Honor.

19             THE COURT:  So I'm required to consider the advisory

20  guidelines range of 151 to 188 months, as well as various other

21  factors that are outlined in a provision of the law that I

22  mentioned earlier.  It's 18 U.S. Code, Section 3553(a), and

23  I've done so.

24             There is no real dispute I don't think about the

25  seriousness of the crime and the harm that it caused to one of

1   the poorest Native American tribes in the country, as well as

2   the clients of Hughes and Atlantic, pension funds held for the

3   benefit of transit workers and longshoremen and housing

4   authority workers and city employees, among others.

5        Mr. Hirst, over the course of two years, you helped

6   steal more than $40 million from numerous pension fund clients

7   and left the Wakpamni Lake Community Corporation without money

8   for economic development and owing more than $60 million on the

9   outstanding bonds.

10       As I noted in ruling on your application to apply the

11  minor role reduction, your involvement in this conspiracy, in

12  my view, was far from minor.  Indeed, as opposed to several of

13  your codefendants, you were charged in all four counts of the

14  indictment.  So I've considered your role.  I've considered the

15  gravity of the crime.  I've considered the number of victims

16  and how they were impacted.

17       In my view, a substantial sentence must be imposed to

18  reflect the seriousness of the offense, to promote respect for

19  the law, to provide just punishment for the offense, and afford

20  adequate deterrence to you and to others who may seek to engage

21  in similar criminal conduct.

22       I have also though considered you as a person, as I

23  must and as I should.  I've considered your age, that you're

24  66.  I've considered your medical issues, both physical and

25  mental, including the apparent onset of the Alzheimer's

disease.

         And I've considered the fact that, by all accounts,
you lived a law-abiding life prior to developing a relationship
with Jason Galanis in 2007.  But since that time, this is your
second securities fraud conspiracy with which you've been
involved, both of which caused significant losses to others, to
victims.

         As the government notes in its submission, in 2017,
only 1.3 percent of defendants sentenced pursuant to Section
2B1.1, that provision of the guidelines, committed crimes
causing losses in excess of $20 million.  Mr. Hirst, you've now
done so twice.

         It's true that compared to Jason Galanis, the admitted
mastermind of the fraud, you personally received significantly
less money, but $1.3 million in criminal proceeds is still a
substantial amount, whether or not you spent it on cars and
jewelry or not, as your lawyer suggested.

         You also played a key role in facilitating Jason
Galanis' much larger theft.  So I've considered all of that,
and I've considered the other arguments that your lawyer has
made, including the need to avoid unwarranted sentencing
disparities.

         As I noted, I read all the letters submitted on your
behalf from family and friends who describe you as loving and
supportive and compassionate.  So I am ready to impose

1    sentence.  So I am going to ask you, please, to stand.

2         It's the judgment of this Court that you be committed

3    to the custody of the Bureau of Prisons for a term of 96 months

4    on Count Two and 60 months on Counts One, Three, and Four to

5    run concurrent to each other and to the sentence imposed by

6    Judge Castel, and 36 months is to run consecutive.  So it's a

7    total of 96.  The 60 months is concurrent, and the 36 months is

8    consecutive many.

9         That term of imprisonment shall be followed by a term

10   of supervised release of three years on each count, also to run

11   concurrent.

12        I believe that this sentence is sufficient but not

13   greater than necessary to comply with the purposes of

14   sentencing set forth in the law.

15        I'm going to ask you just now to sit.  Why don't you

16   be seated so that you're more comfortable.

17        Just to be clear, although this is a below-guideline

18   sentence, I view it as a very serious and substantial sentence,

19   as it should be, given Mr. Hirst's conduct.  But this amount of

20   time, eight years, is a lot of time for someone to spend in

21   prison, particularly for someone who is his age and in his

22   condition, both physically and mentally.  He'll be in his mid

23   70's when he's released.

24        I hope you use the time that you do have to reflect on

25   your actions.

1          With respect to the terms of supervised release, I'm

2     going to impose all of the standard conditions of supervised

3     release.  They're on page 36 of the presentence report.

4          So I'm going to assume you all have read them.  If

5     you'd like me to read them out loud, I'll do so.  But all the

6     standard conditions on page 36 and 37 shall apply.

7          All the mandatory conditions -- they're also on page

8     36 -- shall apply as well.

9          You shall not commit another federal, state, or local

10    crime.  You must not unlawfully possess a controlled substance.

11    You must refrain from any unlawful use of a controlled

12    substance.

13         You must submit to one drug test within 15 days of

14    release from imprisonment and at least two periodic drug tests

15    thereafter as determined by the probation department.

16         You must cooperate in the collection of DNA as

17    directed by the probation officer.  And you must make

18    restitution in accordance with the law, and the various

19    provisions are there set forth on page 36 of the presentence

20    report.

21         In addition, I'm going to impose the special

22    conditions of supervision recommended by the probation

23    department.

24         You must report to the probation office in the federal

25    judicial district where you're authorized to reside within 72

1     hours of your release from imprisonment unless a probation

2     officer instructs you to report to a different probation office

3     or within a different timeframe.

4            After initially reporting to the probation officer,

5     you'll receive instructions from the Court or the probation

6     officer as to how and when you must report to the probation

7     officer, and you must report as instructed.

8            You must not knowingly leave the federal judicial

9     district where you're authorized to reside without first

10    getting permission from the Court or the probation officer.

11           I'm sorry.  I'm reading the standard conditions.  I

12    apologize.  Let me just focus on the special conditions.

13           You are to participate in an outpatient treatment

14    program approved by the United States Probation Office which

15    may include testing to determine if you have reverted to using

16    drugs or alcohol.

17           You must contribute to the cost of services rendered

18    based on your ability to pay and the availability of

19    third-party payments.

20           The Court authorizes the release of available drug

21    treatment evaluations and reports, including the presentence

22    investigation report, to the substance abuse treatment

23    provider.

24           You are to provide the probation officer with access

25    to any requested financial information.  You're not to incur

1   any new credit card charges or open additional lines of credit

2   without the approval of the probation officer unless you're in

3   compliance with the installment payment schedule.  So those are

4   the special conditions of supervised release.

5        I decline to impose a fine in light of the forfeiture

6   and restitution orders that will be imposed.  I am imposing a

7   mandatory special assessment of $400 which shall be paid

8   immediately.

9        Pursuant to the order of restitution that was

10  submitted, you shall pay $43,785,176 in restitution to the

11  victims of the offense as charged in Counts One, Two, Three,

12  and Four.

13       Your liability for restitution will be joint and

14  several with that of other defendants ordered to make

15  restitution for the offenses in this matter.  The names,

16  addresses, and specific amounts owed to each victim are

17  outlined on the schedule of victims, and that schedule will be

18  filed under seal.

19       I know there was reference in the papers to forfeiting

20  $1.3 million, but I don't think I received an order.

21       MR. QUIGLEY:  Yes, your Honor.  We prepared a consent

22  order of forfeiture to bring today.  We're not going to be able

23  to get consent for that.  I won't get into that.

24       I don't think it's disputed that Mr. Levin referenced

25  in his colloquy here that Mr. Hirst received $1.3 million in

1    bond proceeds, and we'd ask the Court to orally include that in

2    the pronouncing of sentence, and we can provide the Court with

3    an order to that effect.

4            THE COURT:  Mr. Levin, is that accurate?  Are you

5    contesting the $1.3 million?

6            MR. LEVIN:  No, we are not, your Honor.  We had

7    acknowledged his receipt of the $1.3 million.  I had a

8    disagreement with the language in the order.  We were unable to

9    work it out.

10           THE COURT:  I am going to impose forfeiture in the

11   amount of $1.3 million.  If there's an issue about the language

12   in the order, just highlight for me what's disputed.

13           MR. QUIGLEY:  Yes, your Honor.

14           THE COURT:  The order ultimately will become part of

15   the judgment in this case.

16           MR. LEVIN:  Your Honor, two quick points.  One, in the

17   Court's judgment, could they ask that he be expedited to be

18   returned to FCI Jesup, Georgia, so he can get some of the help

19   he needs.

20           He's isolated in the MCC.  He's had a toothache for

21   four months.  He can barely walk.  He's not getting his

22   medication.  I can go on and on, but I think the Court gets my

23   point.

24           THE COURT:  Yes.

25           MR. LEVIN:  Secondly, would the Court consider running

1    this sentence partially concurrent with his prior sentence?

2              THE COURT:  What's the government's position on that?

3              MR. QUIGLEY:  I don't think that's legally permissible

4    your Honor.  Under 18 U.S. Code, Section 3585(b)(2) which

5    states that a defendant essentially cannot be given credit for

6    prior -- a defendant shall be given credit towards a service of

7    a term of imprisonment for any time he has spent in official

8    detention prior to the date of sentence the date sentence

9    commences; two, as a result of any other charge for which the

10   defendant was arrested after the commission of the offense for

11   which the sentence was imposed that has not been credited

12   against another sentence.

13             So the period that Mr. Hirst has been in jail before

14   today has been credited against his Gerova sentence.  So he

15   can't or shouldn't get credit for that.

16             THE COURT:  Do you want to respond to that on the law?

17             MR. LEVIN:  Your Honor, I'm not sure I understand.  I

18   don't have the statute in front of me, but I'm not sure I

19   understand the government's argument.

20             The BOP will not give him double credit anyway.  The

21   credit he's received thus far off his 78-month sentence sits,

22   and they give it to him at the end of the sentence in case

23   there are any violations in jail, if he takes any programs and

24   the sentence is further reduced.

25             My application to run this sentence nunc pro tunc is

1     that since he will have -- this sentence overlaps the prior

2     sentence anyway.  So he's not going to be able to get double

3     credit.  However, the 36 months will kick in earlier, in my

4     belief, because your sentence will then run from the same time

5     as the prior sentence.

6          He's not going to get double credit.  He only gets

7     credited for -- every day he gets, he gets that one day.  The

8     BOP does not give anybody double credit.  Nor am I asking the

9     Court to give him credit.  I just want the sentencing date to

10     run from his sentencing which I believe was last August.

11          THE COURT:  Explain to me what difference it will make

12     as a practical matter.

13          So he got a 78-month sentence before Judge Castel.

14     Presuming that he gets good time.  Right?  I think the estimate

15     probation gave is that his estimated release date on that

16     case -- was it June 2023?  Is that right?

17          MR. QUIGLEY:  That's right, your Honor.

18          THE COURT:  So is the idea that before the extra 36

19     months that I'm ordering to be concurrent, that he may have

20     less than 60 months left?  Is that the idea?

21          MR. LEVIN:  Not in terms of credit.

22          THE COURT:  Sorry.  I said concurrent.  I meant

23     consecutive.

24          MR. LEVIN:  I understood the Court's point.

25          Not in terms of credit, but if he were let's say to

1    get into the RDAP program or some of the other programs they

2    have there, once the program is completed, their sentence is

3    shortened.  But he would lose some of that time if this

4    sentence doesn't kick in.

5            It is my understanding before Mr. Hirst came up here

6    and was transferred on this case, he was being accepted in

7    RDAP.  He was on his way to that.  He would lose that.

8            For instance, the drug and alcohol program in

9    prison -- since he was already starting that program when he

10   was transferred up here, I don't want him to lose that time.

11   It may be academic.  I'm just asking because it may help him a

12   little bit at the back end.

13           THE COURT:  Let me ask you a question.

14           Do you think this is something I need to rule on now,

15   or is it something I can decide whether to put that language in

16   the judgment?

17           Do you think I need to say that orally?  Because what

18   I'd like do is look at the provision the government has cited

19   and check with the probation department to determine if this

20   really may have any practical difference.

21           MR. LEVIN:  Your Honor is free to amend your judgment

22   at any time.  You do not have to give it to me --

23           MR. QUIGLEY:  I don't think that's right, your Honor.

24           THE COURT:  You think I need to say it publicly today?

25           MR. QUIGLEY:  No.  That you're free to amend the

1    judgment at any time.

2            THE COURT:  I'm not talking about an amended judgment.

3    If I do the judgment on Monday and I want to look at this over

4    the weekend just to look at the provisions cited, is there any

5    reason this needs to be stated in open court here at

6    sentencing?

7            MR. LEVIN:  I understand your Honor's point.  He

8    doesn't get it unless it's in his judgment.

9            THE COURT:  I understand that.

10           MR. LEVIN:  If the Court wants to research that, we're

11   fine with that.

12           MR. QUIGLEY:  Your Honor, I think my point in citing

13   that provision is that he's -- the only credit he can get for

14   time served before today is the Gerova time he's already

15   serving.  I'm not sure there is any authority to make the

16   sentence nunc pro tunc.  He got a substantially below-guideline

17   sentence for a variety of reasons.

18           THE COURT:  You may well be right.  I'm just trying to

19   figure out what difference it will make, and I haven't quite

20   gotten a direct answer as to what difference it will make.

21           MR. LEVIN:  It may make no difference at all,

22   your Honor.  However, if he completes the RDAP program and they

23   decide to take a year off of his sentence, it may let him out a

24   little earlier because the way they calculate that time, that

25   credit, is on the back end, not the front end.

1          In other words, he doesn't earn that credit until the

2     program is complete.  That's really the issue here.  That's how

3     I view it.

4          THE COURT:  I'll tell you I'm inclined to deny this

5     request, but what I am going to do is just look at the

6     provision that the government cited.  I'm going to consider the

7     request.  I'll either put it in the judgment or I won't.  I

8     don't expect to, but I will take a look at it.  Okay?

9          MR. LEVIN:  Thank you, your Honor.

10          THE COURT:  Is there any legal reason why this

11     sentence cannot be imposed as stated?

12          MR. QUIGLEY:  No, your Honor.

13          MR. LEVIN:  No, your Honor.

14          THE COURT:  So that's the sentence of this Court,

15     Mr. Hirst.  You have a right to appeal your conviction and

16     sentence, except to whatever extent you may have validly waived

17     it as part of a plea agreement.

18          If you do choose to appeal, the notice of appeal must

19     be filed within 14 days of the judgment of conviction.  If

20     you're not able to pay for the costs of an appeal, you may

21     apply for leave to appeal in forma pauperis which simply means

22     that court costs such as filing fees will be waived.  If you

23     request, the clerk of court will prepare and file a notice of

24     appeal on your behalf.

25          There are no open counts.  Is there an underlying

1   indictment that needs to be dismissed?

2           MR. QUIGLEY:  There is, your Honor.  This is S3, and

3   there is an S1.

4           THE COURT:  I'm going to dismiss the underlying

5   indictment.

6           Are there any other applications at this time?

7           MR. QUIGLEY:  Not from the government, your Honor.

8           MR. LEVIN:  No, your Honor.

9           THE COURT:  All right.  We're adjourned.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25